JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Mark B. Koreisl, appeals from the decision of the Cuyahoga County Common Pleas Court, finding him guilty of rape, gross sexual imposition and importuning. Having heard the arguments of the parties and reviewed the pertinent law, we hereby affirm the lower court.
 {¶ 2} Appellant, Koreisl, was arrested on September 28, 2007. Not long after his arrest, Heather Franz called the police to report that her daughter, V.L., [1] had been sexually abused. Heather Franz is the live-in girlfriend of Don Lane, the victim's father. Although Heather Franz is not the legal mother of the victim, V.L. treats Heather as if she is her mother.[2] V.L. has lived with Heather and Don approximately since she was four years old. Heather and Don's three other minor children also live with them. Appellant, Koreisl, is unrelated to the victim.
 {¶ 3} Heather Franz met Amanda Parker, the live-in girlfriend of appellant, on the internet in 2007. The families then began spending time with each other over the course of the summer, interacting with each other and becoming friends. Don and Heather were having financial problems that led to their electricity being shut off. In order to help them financially, appellant and his girlfriend, Amanda, offered to let Don, Heather and their children stay with them for a very short period of time. The *Page 4 
families moved in together in the summer of 2007. It was during this time that V.L. was sexually abused by appellant, Koreisl.
 {¶ 4} According to the case file, appellant was indicted on October 22, 2007 in a 15-count indictment. Counts one through three charged appellant with rape in violation of Section 2907.02(A)(1)(b) of the Revised Code. The trial court later noted that count one pertained to vaginal rape, count two pertained to anal rape and count three pertained to fellatio. Count four of the indictment charged appellant with disseminating obscene matter to a juvenile in violation of R.C. 2907.31(A)(1). Count five charged appellant with importuning in violation of R.C. 2907.07(A). Counts six through fifteen charged appellant with gross sexual imposition in violation of R.C. 2907.05(A)(4). The grand jury further specified that appellant was a sexually violent predator in counts one through three and counts six through fifteen.
 {¶ 5} On January 14, 2008, Koreisl was fully advised in open court of his constitutional rights and the penalties for his alleged acts. Pre-trial issues were heard on the record. A competency voir dire was conducted of the minor victim and she was found to be competent to testify. Defendant, Koreisl, executed a written jury trial waiver and, on the record, orally waived his right to a trial by jury. A bench trial commenced.
 {¶ 6} On January 15, 2008, the prosecution concluded its case. The defense made a Rule 29 motion as to all counts but specifically as to the rape counts one through three. The trial court overruled the motion as to counts one through three. *Page 5 
However the motion was granted as to count four, disseminating obscene matter, and counts 12 through 15, gross sexual imposition.
 {¶ 7} On January 16, 2008, closing arguments were made and the court recessed for deliberation. On January 17, 2008, the court found Koreisl not guilty of rape as charged in counts one and two of the indictment; guilty of rape as charged in count three of the indictment; guilty of importuning as charged in count five of the indictment; guilty of gross sexual imposition as charged in counts six, eight, ten and eleven of the indictment; and not guilty of gross sexual imposition as charged in counts seven and nine of the indictment. Sentencing was scheduled for January 22, 2008.
 {¶ 8} On January 22, 2008, the prosecution, defense counsel and defendant addressed the court and sentence was imposed. The court imposed a prison sentence of 15 years to life to be served at the Lorain Correctional Institution.[3]
 {¶ 9} Koreisl was given credit for time served in the county jail, and given postrelease control for five years upon release as part of his prison sentence. Koreisl filed his appeal with this court on January 25, 2008.
 {¶ 10} Appellant Koreisl assigns three errors on appeal:
 {¶ 11} [1.] "The appellant was denied due process when the court based its convictions on insufficient evidence." *Page 6 
 {¶ 12} [2.] "The appellant's convictions are against the manifest weight of the evidence."
 {¶ 13} [3.] "The appellant's maximum and consecutive sentence is contrary to law."
 {¶ 14} Because of the substantial interrelation between appellant's first and second assignments of error, we shall address them together. Appellant argues that the state failed to present sufficient evidence and his convictions were against the manifest weight of the evidence. We do not find merit in appellant's arguments.
 {¶ 15} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. With respect to sufficiency of the evidence, sufficiency is a term of art meaning that legal standard that is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.
 {¶ 16} Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may, nevertheless, conclude that the judgment is against the weight of the evidence. Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jurors *Page 7 
that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, their verdict shall find the greater amount of credible evidence sustains the issue that is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. Id.
 {¶ 17} As to a claim that a judgment is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. State v. Martin (1983),20 Ohio App.3d 172, 20 Ohio B. 215, 485 N.E.2d 717. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.
 {¶ 18} It is with the above standards in mind that we begin our analysis of the case at bar. The record demonstrates that significant evidence and direct testimony were presented at trial. The victim in this case testified that she was nine years old *Page 8 
and that appellant sexually molested and raped her several times over a brief period during the summer of 2007.
 {¶ 19} V.L. testified about an encounter with appellant that occurred the first time she stayed over appellant's house. The victim testified that in late July of 2007, she was taking a bath with Amanda's daughter, Katie, who was around three years old at the time. As previously mentioned, Amanda is appellant's live-in girlfriend. The victim testified that appellant came into the bathroom when she was taking a bath with Katie and she told appellant to close the door. Appellant did not close the door and the victim got out of the bathtub and shut the door.
 {¶ 20} The victim provided additional testimony concerning another incident that happened in August of 2007, a day in which the victim's mother went to look at a house. The victim was at appellant's home. While the victim was getting the pool ready, appellant said he wanted to go into his room and asked the victim if she wanted to watch him "jack off."[4] She replied that she did not know what that meant. Appellant responded that she would find out.[5] Appellant told the victim that he was going to his room and he wanted her to look through a peephole in the door. The victim looked through the peephole and saw appellant with his pants and underwear off. The victim saw appellant, "holding his penis, waving it around and then holding *Page 9 
his hand on it, pushing it up and down really fast."[6] The victim also recalled seeing "white stuff coming out."[7]
 {¶ 21} On that same day, the victim was getting ready to go into the pool. The victim told appellant that she needed to change into her bathing suit. Appellant told her to go change in his room. The victim went into appellant's room to change and as she was changing, she saw appellant's eye looking through the peephole.[8]
 {¶ 22} Later that day, appellant told the victim that he wanted her to go with him to get his check cashed. The victim stated that appellant was pestering her all day to go with him. The record provides the following:
 Ms. Carr: "What happened?"
 V.L.: "Then when — first he kept on pestering me all day saying, I'm going to ask your mom if you can come with me because he had to go get his check cashed."
 Ms. Carr: "How did you know that?"
 V.L.: "He was telling me. He was saying, I'm going to go. I want you to come with me, get my check cashed with me." *Page 10 
 Ms. Carr: "What did you say?"
 V.L.: "Okay, But I got to ask my mom. No, I'll ask her, he said."[9]
 {¶ 23} The victim further testified that she got into appellant's truck and drove to appellant's work. Afterwards, appellant drove to get his check cashed but stopped at Brookside Reservation first. Appellant parked his truck and pulled down his pants. The victim testified that she observed appellant pulling out his penis and masturbating.[10]
 {¶ 24} The victim stated that after this incident, appellant got out of his truck and walked over to a bench. While appellant was sitting on the bench he attempted to masturbate. The victim stated that she saw appellant "sliding his hand down there."[11] The victim testified as follows:
 Ms. Carr: "Where did you sit?"
 V.L.: "There is a bench there."
 Ms. Carr: "What happened when you sat on the bench?"
 V.L.: "He said that he took other girls up there."
 Ms. Carr: "What did you say?"
 V.L.: "I said, what did you do?" *Page 11 
 Ms. Carr: "Did he respond to you?"
 V.L.: "Yes."
 Ms. Carr: "What did he say?"
 V.L.: "He said he was f**king them up there."
 Ms. Carr: "Were those his words?"
 V.L.: "Yes."
 * * *
 Ms. Carr: "Okay. So what happened as you were sitting on the bench? Did anything happen?"
 V.L.: "He was trying to jack off."
 * * *
 Ms. Carr: "How do you know he was trying to jack off ?"
 V.L.: "Because he kept sliding his hand down there."[12]
 {¶ 25} The victim stated that she then went back to appellant's car with him. However, appellant's car would not start. Appellant eventually got his car jumped and started. He then drove to a check-cashing place with the victim and had to have his car jumped again. Appellant then drove to an auto parts store to get his battery charged. The victim testified that her dad called appellant's cell phone during this time and spoke with appellant. The victim's dad wanted to talk to her and appellant *Page 12 
gave her the phone. Don, the victim's dad asked how she was doing and she replied that she was doing all right.
 {¶ 26} Additional testimony was provided by the victim concerning another incident that occurred in early September 2007. The victim went with her family, Amanda, appellant and the kids to Tinker's Creek for a picnic. Appellant told the victim that he wanted to take a walk in the park with her and two of the younger children.[13] The victim testified that appellant told the younger children to go behind the bushes so they couldn't see. The victim testified that appellant then pulled down his pants and started masturbating. V.L. testified that appellant told her that he wanted her to suck his penis. V.L. then testified that appellant shoved his penis into her mouth, gaging her and causing her to throw up.[14] The victim stated that the two younger children were watching the ducks while appellant was assaulting her. The victim further testified that when they got back to the picnic area where everyone else was, she told her mom that she threw up. However, when the victim's mom asked her why, she said that it was because of the heat. The victim also testified that this was not the first time appellant had her perform oral sex on him.[15]
 {¶ 27} Additional testimony in the record establishes that the victim was at appellant's house after Labor Day. The victim was setting up tents with appellant's children. V.L. testified that she was playing three little pigs with appellant's children *Page 13 
and he used his hand to feel her private area.[16] Afterwards, appellant kissed the victim on the lips. Later that night, appellant put on a movie called "The Devil's Rejects." The victim remembers watching a "very bad part" of the film. The victim testified that she watched a scene in the movie where a man and woman were engaging in sexual intercourse. Later than night, the victim was sleeping in appellant's tent. The victim testified that appellant took out his penis and tried to put his penis up her shorts. Appellant then began to masturbate.[17]
 {¶ 28} The victim further testified that appellant anally raped her. V.L. testified that the first time appellant penetrated her buttocks she was sleeping over at his house. Appellant pulled his bed into the living room. The victim testified that, in the morning while the other children were in the room, appellant began to put his penis into her buttocks.
 {¶ 29} V.L. also testified that on another occasion, the victim was in appellant's bathroom and appellant walked in and told her that he wanted her to perform oral sex on him.[18] V.L. remembers that she was kneeling and appellant pushed his penis all the way down into her mouth. She gagged and threw up into the toilet. Appellant proceeded to masturbate and ejaculated into her mouth. *Page 14 
 {¶ 30} After appellant ejaculated, he told the victim that he wanted to perform oral sex on her.[19] Appellant told the victim to pull down her pants and then appellant began licking the victim's vagina. Appellant then turned the victim around and began putting his tongue into her buttocks. Appellant then asked the victim if he could "f**k her."[20] Before the victim could respond, appellant began putting his "private" into her butt and kept telling the victim that it would "feel really good."[21] September 22, 2007 was the last day the victim was ever at appellant's home. The next day the she broke down and told her mom what had happened and her mom called the police.
 {¶ 31} Moreover, Carla Stiltner, Heather Franz, Larry Petrus and Detective Howard all provided significant testimony and evidence further supporting the trial court's decision. Carla Stiltner, is a Registered Nurse (RN), who examined the victim at Fairview Hospital. In addition to Ms. Stiltner's testimony, the victim's medical chart and various forms, i.e., triage notes, medical records, were admitted into evidence.
 {¶ 32} Nurse Stiltner testified that the victim came into the hospital "complaining that she was having trouble peeing."[22] After speaking with the victim, her parents and the doctor, Nurse Stiltner retrieved her supplies, a rape kit and her nurse notes. Nurse Stiltner testified that she called the Rape Crisis Center, obtained *Page 15 
a urine specimen, contacted the police department and had a interview with the victim. The nurse further testified that she wrote in her child interview notes that the victim stated that appellant penetrated her buttocks with his penis, forced her to engage in oral sex and ejaculated on her.[23]
 {¶ 33} Nurse Stiltner testified that she also conducted an examination of the victim. The nurse reported that her examination revealed that the victim had no external hymenal tissue present. She stated that this tissue is usually present a majority of the time in pre-pubescent girls.
 {¶ 34} Nurse Stiltner also read through her notes concerning the rape kit forms. The nurse testified that her form notes, like her interview notes, also indicated that the victim told her that appellant anally penetrated her with his penis. The rape kit form notes also stated that appellant engaged in oral sex with the victim and ejaculated on her.[24] The testimony of Nurse Stiltner further corroborates the victim's testimony and further supports the lower court's verdict.
 {¶ 35} In addition to the testimony and evidence provided by Nurse Stiltner, Larry Petrus, an employee of Cuyahoga County Department of Children and Family Services (CCDCFS), also testified in the case at bar. Mr. Petrus is employed in the sex abuse intake department at CCDCFS. He has been employed with the sex abuse intake department for sixteen years, has a B.A. in psychology and engages in *Page 16 
ongoing training at the agency for his position.[25] Mr. Petrus testified that he generated an investigation and assessment report concerning victim, V.L., in this case. Mr. Petrus testified as to information in his report. This information corroborates the victim's previous testimony as to the sexual abuse she received from appellant on several different occasions and offers further support as to the lower court's decision.[26]
 {¶ 36} In addition to the testimony from the victim, the nurse and the sex abuse worker, the victim's "mother" also testified. Heather Franz testified that the victim and her had conversations about the sexual abuse, what occurred, when it occurred and who was responsible. Ms. Franz's testimony also corroborates the previous testimony mentioned above and also supports the lower court's decision as well.[27]
 {¶ 37} Detective Sherilyn Howard also provided testimony supporting the lower court's verdict. Detective Howard has worked for the sex crimes unit of the Cleveland Police Department for sixteen years and has been a police officer for twenty-six years. Detective Howard testified that she showed the victim anatomically correct drawings of an adult male and a grammar school female. Detective Howard further testified that she used these drawings in conjunction with information she received from the victim during an interview she conducted. The information *Page 17 
Detective Howard received and the testimony she gave in court corroborated the victim's testimony and provided additional support for the lower court's decision.
 {¶ 38} We find that the significant testimony and evidence presented to the trial court supports its verdict. In addition, after reviewing the entire record, weighing all of the evidence and all reasonable inferences, considering the credibility of witnesses, and resolving any conflicts in the evidence, this court finds nothing to indicate that the trial court lost its way. We find no error on the part of the lower court and find its actions to be entirely proper.
 {¶ 39} Accordingly, appellant's first and second assignments of error are overruled.
 {¶ 40} Appellant argues in his third assignment of error that his sentence was contrary to law. Specifically, appellant argues that the trial court failed to make a record of facts or circumstances that would justify the maximum, consecutive sentence he received. However, contrary to appellant's argument, the trial court is not required to make a record of facts or circumstances justifying the imposition of maximum and consecutive sentences in this case.
 {¶ 41} Clear and convincing evidence is the appropriate standard of review with respect to sentencing in this case. R.C. 2953.08(G)(2) provides that an appellate court may not increase, reduce, or otherwise modify a sentence imposed under S.B. No. 2 unless it finds, by clear and convincing evidence, that the sentence is not supported by the record or is contrary to law. Clear and convincing evidence is more than a mere preponderance of the evidence; it is that evidence which will *Page 18 
provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. State v. Patterson, Cuyahoga App. No. 84803, 2005-Ohio-2003.
 {¶ 42} Even after State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470, a trial court is still required to consider the factors set forth in R.C. 2929.11. In State v. Mathis, 109 Ohio St.3d 54,2006-Ohio-855, 846 N.E.2d 1, decided the same day as Foster, the Supreme Court of Ohio held that the portions of the sentencing code to be considered include the purposes of felony sentencing in R.C. 2929.11, and the seriousness and recidivism factors in R.C. 2929.12. The court must also consider the record, any information presented at the sentencing hearing, any presentence investigation report, and any victim impact statement. R.C. 2929.19(B)(1); Mathis at 37. See, also, State v.Miller, Cuyahoga App. No. 87396, 2006-Ohio-4894, at 34.
 {¶ 43} Here, the evidence demonstrates that the lower court acted properly. The evidence and the sentencing transcript both reflect that the trial court made the necessary considerations prior to imposing sentence on appellant. The trial judge's statements demonstrate that the court considered the particular facts and evidence involved in appellant's crimes.[28] The analysis was done so that the court could issue an appropriate sentence. *Page 19 
 {¶ 44} Under Ohio law, judicial fact-finding is no longer required before a court imposes maximum, consecutive, or more than the minimum prison terms. Instead, a trial court is vested with full discretion to impose a prison term within the statutory range. In exercising its discretion, the trial court must carefully consider the statutes that apply to every felony case, including R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of an offender and statutes that are specific to the case itself. Therefore, post-Foster, trial courts are still required to "consider" the general guidance factors in their sentencing decisions; however, there is no requirement that this be done on the record.State v. Dismukes, Cuyahoga App. No. 89169, 2007-Ohio-5847.
 {¶ 45} The evidence clearly shows that the court's actions were proper. A review of the transcript shows that all required factors of the law were considered. Moreover, appellant failed to provide any cases or additional data to support his position that a fifteen years to life sentence in this particular situation is contrary to law.
 {¶ 46} In addition, we find appellant's argument concerning a finding of force to be unfounded. Appellant argues that a finding of force was necessary to impose a life sentence. Under former law, a finding of force was necessary to impose a life sentence upon a defendant found guilty of R.C. 2907.02(A)(1)(b).
 {¶ 47} R.C. 2907.02 was amended and the language requiring force or threat of force was deleted from the subsection. Appellant was convicted of rape in *Page 20 
violation of R.C. 2907.02(A)(1)(b). The law in effect at the time of the offense applies. State v. Williams (2004), 103 Ohio St.3d 112. R.C. 2907.02(B), as in effect at the time of the rape (offense), relevantly states:
 "Except as otherwise provided in this division, notwithstanding sections 2929.11 to 2929.14 of the Revised Code, an offender under division (A)(1)(b) of this section shall be sentenced to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code. [. . . ] if the victim under division (A)(1)(b) of this section is less than ten years of age, in lieu of sentencing the offender to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code, the court may impose upon the offender a term of life without parole."
(Emphasis added.)
R.C. 2907(A)(1)(b) prohibits sexual conduct when the victim is under the age of thirteen. In the case at bar, appellant raped the victim when she was nine years old.
 {¶ 48} Moreover, the trial judge informed appellant at sentencing that "in my contemplation of the guilty verdict, I also envisioned that the body of the complaint of rape in the indictment was in fact why this Court was finding him guilty, both that there was force or threat of force as well as the victim's age being under ten years old at the time of the offense."[29] This court also notes that there is an indication in the record that appellant was threatening the victim immediately after sentencing.[30] *Page 21 
 {¶ 49} We find no error on the part of the lower court. We find that the evidence in this case demonstrates that the trial judge considered all relevant and necessary general guidance factors in his sentencing decision before sentencing appellant.
 {¶ 50} Accordingly, based on the evidence in the case at bar we find no error in the lower court's sentencing of appellant.
 {¶ 51} Accordingly, appellant's third assignment of error is overruled.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., and MARY JANE BOYLE, J., CONCUR
[1] We refer to the children by their initials pursuant to this court's established policy not to disclose the names of children. Here, we refer to the victim in this case as V.L.
[2] Although Heather Franz is not the victim's legal mother, for simplicity, she will be referenced as her mother in various portions of this opinion.
[3] Ten years to life on count three; one year on count five; one year on each of counts six, eight, ten and eleven to run consecutive with each other and consecutive with count three, for a total of fifteen years to life.
[4] Tr. 248.
[5] Tr. 248.
[6] Tr. 250.
[7] Tr. 250.
[8] Tr. 252.
[9] Tr. 253-54.
[10] Tr. 259.
[11] Tr. 262.
[12] Tr. 261-62.
[13] Tr. 268.
[14] Tr. 269.
[15] Tr. 270-71.
[16] Tr. 276.
[17] Tr. 280.
[18] Tr. 282.
[19] Tr. 283.
[20] Tr. 284.
[21] Tr. 284.
[22] Tr. 74.
[23] Tr. 86-87.
[24] Tr. 97-98.
[25] Mr. Petrus has received training in forensic interviewing from Case Western Reserve and from Kent State. In addition Mr. Petrus has conducted over 1,600 sex abuse cases over the last 16 years in his capacity as a employee in the sex abuse intake unit.
[26] Tr. 204, 210-219.
[27] Tr. 142-147.
[28] Tr. 521-524.
[29] Tr. 521.
[30] The record demonstrates that the court deputy told the trial judge that appellant was threatening the victim immediately after sentencing. THE COURT: "We'll go back on the record with respect to this case, Mr. Koreisl." THE DEPUTY: "He got big balls, your Honor, he wants to tell you something." ***. THE DEPUTY: "Mr. Koreisl was making threats towards the victim stating that when he gets out she's got something coming to her and he hopes they die on the ride home and so on." Tr. 529. *Page 1